**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2105-24

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JARON D. REEVEY,
a/k/a JONATHAN LEE and
JARONE REEVEY,

      Defendant-Appellant.

_____

Submitted March 17, 2026 – Decided July 1, 2026

Before Judges Susswein and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 03-11-2080.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

Raymond S. Santiago, Monmouth County Prosecutor, attorney for respondent (Monica do Outeiro, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

   This prosecution has a long history of direct and collateral appeals arising from a murder committed in May 2000. Defendant Jaron Reevey was convicted in 2005 of the murder of George Lockhart, a Rite Aid pharmacist. The crime involved a plan to steal Lockhart's vehicle, during which a struggle ensued and Lockhart was fatally shot. The State's key witness was codefendant Sabrina Wright, defendant's then seventeen-year-old girlfriend. Wright pled guilty to second-degree armed robbery and agreed to testify against defendant in exchange for a reduced sentence. In 2018, Wright gave a statement to a defense investigator recanting her trial testimony.

   In the matter before us, defendant appeals a December 13, 2024, Law Division order denying reconsideration of his motion for a new trial.[1] Defendant's primary contention is that the trial court erred in denying his motion for a new trial based on Wright's 2018 recantation statement. Defendant seeks a new trial or in the alternative, a remand for an evidentiary hearing. Defendant

---

[1] Defendant filed a petition for post-conviction relief (PCR) on May 24, 2012. Because more than a year had transpired since the PCR court's ruling on June 19, 2019, defendant was time barred from filing a subsequent PCR petition pursuant to Rule 3:22-4(b). Consequently, rather than filing a second PCR petition, defendant filed the present motion for a new trial.

A-2105-24

also argues that proffered alibi affidavits constitute newly discovered evidence establishing an alibi and warranting a new trial.

After reviewing the record in light of the governing legal principles, we affirm the motion court's[2] holding that the proffered alibi affidavits do not warrant a new trial. However, we deem it necessary to remand for an evidentiary hearing with respect to Wright's 2018 recantation. The court concluded that her recantation would not have altered the trial outcome because her credibility had been impeached at trial. The applicable legal test, however, is whether Wright's testimony at trial was probably false. No court has yet had an opportunity to observe Wright's testimony regarding her 2018 recantation statement. We therefore deem it prudent to remand for an evidentiary hearing at which Wright can testify and be subject to cross-examination so that the motion court can determine whether her trial testimony was probably false.

We acknowledge the skepticism that is accorded under the law to belated recantations, and we offer no opinion on her veracity. However, considering the stakes, we believe the motion court should make the determination as to when she was not telling the truth—at the jury trial or thirteen years later when

---

[2] We use the term "motion court" to refer to the judge who denied defendant's present motion for a new trial.

speaking with the Public Defender's investigator—after having an opportunity to observe and assess her live testimony.

I.

We presume the parties are well acquainted with the proofs presented at the murder trial and the ensuing direct and collateral appeals. We therefore only briefly summarize the facts and procedural history pertinent to the issues presently before us.

No physical evidence was presented at trial linking defendant to the murder. The State's case hinged on Wright's testimony. She testified that she and defendant planned to steal Lockhart's Mercedes automobile. Wright explained that she approached Lockhart as he left the pharmacy to distract him, then walked away. She further testified that, when defendant approached Lockhart, she observed a "slight struggle," heard a gunshot, and saw defendant running away.

Wright testified that immediately following the shooting, she and defendant met in the woods near the crime scene and defendant admitted to her that he had shot Lockhart because he would not give him the car key and had seen defendant's face. She testified that defendant had a black revolver and told her it did not leave shell casings.

4

On cross-examination, Wright was questioned about the plea agreement she made with the State in exchange for her testimony. Defense counsel also questioned Wright about statements she made that, after initially pleading not guilty, she decided to take a plea offer because she had no chance of success at trial as a black defendant in front of what was likely to be an all-white jury. It was also revealed on cross-examination that Wright lied in her initial statement to police inculpating defendant. Wright was also cross-examined about a March 31, 2004, letter she wrote to defendant where she described wanting to "get home as soon as possible by any means necessary."

In addition to Wright's testimony, the State presented several jailhouse informants who reported on defendant's inculpatory admissions to them. The jury found defendant guilty of knowing/purposeful murder, N.J.S.A. 2C:11-3(a)(l)-(2) (count one); felony murder, N.J.S.A. 2C:11-3(a)(3) (count two); armed robbery, N.J.S.A. 2C:15-1 (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count five); and second-degree conspiracy, N.J.S.A. 2C:5-2 (count six). On direct appeal, we affirmed the murder conviction but reversed several lesser convictions due to improper jury instructions. State v. Reevey, No. A-1414-05 (App. Div. Apr. 10, 2008).

A-2105-24

The State did not retry the vacated counts. Defendant was re-sentenced to life imprisonment with a thirty-five-year period of parole ineligibility. We affirmed the sentence and the New Jersey Supreme Court denied defendant's petition for certification. State v. Reevey, 196 N.J. 85 (2008).

In May 2012, defendant filed a PCR petition alleging ineffective assistance of trial and appellate counsel. Defendant specifically claimed that both failed to advise him of the five-year time limit for seeking PCR relief, pursuant to Rule 3:22-12(a)(1), and that trial counsel failed to introduce exculpatory documents and to subpoena alibi and other defense witnesses. The PCR court denied defendant's petition without an evidentiary hearing. We reversed that decision in part and remanded for an evidentiary hearing regarding counsel's failure to investigate and present alibi witnesses. State v. Reevey, No. A-5882-13 (App. Div. Nov. 4, 2016).

An evidentiary hearing was held on separate dates between November 2017 and April 2019. On June 13, 2019, the PCR court issued an oral opinion again denying defendant's petition, finding no ineffective assistance. We affirmed that decision. State v. Reevey, No. A-5379-18 (App. Div. Aug. 9, 2021).

A-2105-24

On November 15, 2018, Wright met with Leonard S. Thomas, an investigator with the Office of the Public Defender, and relayed to him that her initial statement to police inculpating defendant was a result of police coercion. Specifically, she told the investigator that officers told her, "what she had done; where she was; what she should say and what papers she should sign." According to Wright, police officers kept her at the station for several hours, denied her request to call her mother, failed to read her rights, and would not let her leave until she signed the documents stating that she and defendant were at the Rite Aid and that she saw defendant shoot the victim. Wright stated that "[s]he was an overwhelmed, scared kid."

Wright further stated that she did not see police again until after a separate shooting that occurred in Baltimore in January 2002, in which defendant was shot by police. Wright told the investigator that, at the time of the Baltimore shooting, police "threatened her that she had to cooperate with them if she wanted to see [defendant] (after he had been shot)" and that if he died, she would "take the weight." She further stated to the investigator that her prior statements were "absolutely false" and that she was now willing to testify on defendant's behalf. Wright also wrote several letters to defendant while he was incarcerated expressing remorse for implicating him in the Rite Aid homicide.

7

In May 2023, defendant filed the present motion for a new trial based upon newly discovered evidence, namely, Wright's November 15, 2018, statement recanting her trial testimony and expressing willingness to testify on his behalf. Defendant also submitted additional letters Wright had written to him, further indicating that she had implicated defendant to obtain a favorable plea deal. Defendant's petition also included affidavits from three purported alibi witnesses.

On June 25, 2024, the trial court issued an order and sixteen-page written decision denying defendant's motion for a new trial. The court determined that neither Wright's recantation nor the proffered alibi witness affidavits met all three prongs of the Carter[3] test necessary to grant a new trial based on newly discovered evidence. The court found that Wright's recantation was not newly discovered, as some of the letters from Wright to defendant were known at the time of trial, and Wright was cross-examined at trial about a March 31, 2004 letter. The court characterized the newly produced 2018 recantation as "the next logical step" of that correspondence.

---

[3] State v. Carter, 85 N.J. 300, 314 (1981).

A-2105-24

The court concluded that while Wright's recantation was material, it would not have affected the verdict because her credibility had already been impeached at trial and the jury was aware of her plea agreement. The trial court noted that Wright's prior letter expressing concerns about testifying had already been admitted, and thus her 2018 recantation presented "limited value" that would not have changed the jury's verdict. The court also ruled that defendant failed to show this evidence could not have been discovered earlier.

As to the proffered alibi affidavits, the trial court determined that the information offered by the affiants was known to defendant at the time of trial and thus was not newly discovered.

Defendant moved for reconsideration of the court's denial of his motion for a new trial. On December 14, 2024, the court denied the reconsideration motion. This appeal followed. Defendant contends that the trial court improperly denied his motion for a new trial.

## II.

We first address defendant's arguments concerning Wright's 2018 recantation statement. We begin by acknowledging the legal principles governing this appeal.

9

Motions for a new trial are governed by Rule 3:20-1, which provides in relevant part:

> The trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice . . . The trial judge shall not, however, set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law.

To warrant a new trial based on newly discovered evidence, a defendant must satisfy the three-prong test set forth by our Supreme Court in State v. Carter:

> [T]o qualify as newly discovered evidence entitling a party to a new trial, the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted.
>
> [85 N.J. at 314 (citing State v. Artis, 36 N.J. 538, 541 (1962)).]

"Failure of a defendant to satisfy any one of the three prerequisites of newly discovered evidence is sufficient to warrant a denial of a motion for a new trial." State v. Johnson, 34 N.J. 212, 223 (1961).

A-2105-24

As to the first prong, "[m]aterial evidence is any evidence that would 'have some bearing on the claims being advanced.'" State v. Ways, 180 N.J. 171, 188 (2004) (quoting State v. Henries, 306 N.J. Super. 512, 531 (App. Div. 1997)). "Clearly, evidence that supports a defense, such as alibi, third-party guilt, or a general denial of guilt would be material." Ibid.

Prong two "requires that the new evidence must have been discovered after completion of trial and must not have been discoverable earlier through the exercise of reasonable diligence." Id. at 192 (citing Carter, 85 N.J. at 314). "A defendant is not entitled to benefit from a strategic decision to withhold evidence." Ibid. (citing State v. Drisco, 355 N.J. Super. 283, 290-91 (App. Div. 2002) (holding that defense attorney's strategic decision to withhold alibi defense did not constitute ineffective assistance of counsel)).

"[P]rongs one and three are inextricably intertwined. Thus, 'evidence [that] would shake the very foundation of the State's case and almost certainly alter the earlier jury verdict' could not be categorized as 'merely cumulative.'" State v. Nash, 212 N.J. 518, 549-50 (2013) (second alteration in original) (quoting Ways, 180 N.J. at 189). "The power of the newly discovered evidence to alter the verdict is the central issue, not the label to be placed on that evidence." Ibid. (quoting Ways, 180 N.J. at 191-92). "[E]vidence that would

11

have the probable effect of raising a reasonable doubt as to the defendant's guilt would not be considered merely cumulative, impeaching, or contradictory." Id. at 549 (quoting Ways, 180 N.J. at 189).

"One important caveat must be kept in mind." Id. at 550. "[E]vidence clearly capable of altering the outcome of a verdict that could have been discovered by reasonable diligence at the time of trial would almost certainly point to ineffective assistance of counsel." Ibid. (alteration in original) (quoting Ways, 180 N.J. at 192). "We would not require a person who is probably innocent to languish in prison because the exculpatory evidence was discoverable and overlooked by a less than reasonably diligent attorney." Ways, 180 N.J. at 192 (citing Strickland v. Washington, 466 U.S. 688, 694 (1984)).

"Newly discovered evidence must be reviewed with a certain degree of circumspection to ensure that it is not the product of fabrication, and, if credible and material, is of sufficient weight that it would probably alter the outcome of the verdict in a new trial." Id. at 187-88 (citing State v. Buonadonna, 122 N.J. 22, 51 (1991) (finding "sketchy" evidence insufficient to warrant new trial)). "However difficult the process of review, the passage of time must not be a bar to assessing the validity of a verdict that is cast in doubt by evidence suggesting that a defendant may be innocent." Id. at 188.

"[T]he reviewing court must engage in a thorough, fact-sensitive analysis to determine whether the newly discovered evidence would probably make a difference to the jury." Id. at 191. The strength of the State's case at trial is a factor to be weighed in determining whether the newly discovered evidence would change the jury's verdict. See id. at 194-95 ("There were substantial questions raised concerning the credibility and reliability of the witnesses for both the State and the defense at trial. The jury by its verdict answered those questions in favor of the State. We cannot ignore, however, that the State's proofs were far from overwhelming".).

"[M]otions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations." Herrera v. Collins, 506 U.S. 390, 417 (1993). "Appellate courts should defer to trial courts' credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience." State v. Locurto, 157 N.J. 463, 474 (1999).

The motion court is not categorically required to engage in its own credibility determinations, separate from the original court's conclusions; rather, the motion court must describe in the record the existing testimony undergirding

13

its contemporaneous credibility determinations.  See Locurto, 157 N.J. at 474-75 (explaining that although the Law Division did not make independent credibility findings, "it described on the record the evidence and testimony presented before the Municipal Court that persuaded it to 'accede' to the Municipal Court's credibility determinations" and concluding that the "comments made on the record by the lower courts were sufficient to support" the conclusion that a police officer witness was more credible than the defendant).

We note that case law addressing newly discovered evidence in the form of recantation emphasizes that "the sincerity of a recantation is to be viewed with 'extreme suspicion.'"  State v. Hogan, 144 N.J. 216, 239, (1996) (quoting United States v. Santiago, 837 F.2d 1545, 1550 (11th Cir. 1988)).  See also Ways, 180 N.J. at 197 (describing recantation testimony generally "as suspect and untrustworthy" (quoting State v. Carter, 69 N.J. 420, 427 (1976))); State v. Engel, 249 N.J. Super. 336, 386 (App. Div. 1991) ("Prisoners often have nothing to lose and much to gain by repudiating their trial testimony.  For that reason, we regard recantations as inherently suspect").  Given the unreliability of recantation testimony, "[t]he burden of proof rests on those presenting such testimony to establish that [the recantation] is probably true and the trial

14                                                              A-2105-24

testimony [is] probably false." State v. Feaster, 184 N.J. 235, 264 n.14 (2005) (quoting Carter, 69 N.J. at 427).

Furthermore, when an application for a new trial is based on newly discovered evidence in the form of recantation testimony, "[t]he issue for the trial court upon the application for a new trial 'is not whether the new story, had it been available at trial, would have impugned the credibility of the witness.'" Engel, 249 N.J. Super. at 386 (quoting State v. Baldwin, 47 N.J. 379, 400 (1966)). "Obviously, a new and different version under oath would necessarily raise questions concerning the credibility of the witness's trial testimony." Ibid.

Rather, "[t]he appropriate test is 'whether the testimony given at the trial was probably false' and whether 'on that account there is a substantial possibility of [a] miscarriage of justice.'" Id. at 386 (second alteration in original) (quoting Baldwin, 47 N.J. at 400). "The trial judge is thus obliged to consider 'where the truth probably lies.' If the judge is satisfied that the present testimony of the recanting witness is untrue, the application must be denied." Ibid. (quoting Baldwin, 47 N.J. at 400). See also Carter, 69 N.J. at 427 ("The test for the judge in evaluating a recantation upon a motion for a new trial is whether it casts serious doubt upon the truth of the testimony given at the trial and whether if believable, the factual recital of the recantation so seriously impugns the entire

15

trial evidence as to give rise to the conclusion that there resulted a possible miscarriage of justice." (quoting State v. Puchalski, 45 N.J. 97, 107-08 (1965))).

We add that a trial court's decision on a motion for a new trial is generally reviewed for an abuse of discretion. State v. Fortin, 464 N.J. Super. 193, 216 (App. Div. 2020). Stated another way, appellate review "is limited to a determination of 'whether the findings made by the trial court could reasonably have been reached on sufficient credible evidence present in the record.'" State v. Brooks, 366 N.J. Super. 447, 454 (App. Div. 2004) (quoting State v. Russo, 333 N.J. Super. 119, 137 (2000)).

Importantly for purposes of this appeal, the deference we owe to a trial court's decision is due in part to its ability to observe witness testimony. See Brooks, 366 N.J. Super. at 454 ("[W]e will 'give deference to the trial judge's feel for the case since [they] presided over [it] . . . and had the opportunity to observe and hear the witnesses as they testified.'" (second alteration in original) (quoting Russo, 333 N.J. Super. at 137)). However, as our Supreme Court has explained, that deference does not extend to all areas of the trial court's decision:

> The standard governing an appellate tribunal's review of a trial court's action on a new trial motion is essentially the same as that controlling the trial judge . . . . We say the test is 'essentially the same,' because where certain aspects are important—witness credibility, 'demeanor,' 'feel of the case,' or other

A-2105-24

criteria which are not transmitted by the written record—,the appellate court must give deference to the views of the trial judge thereon. [The trial judge's] decision, however, is not entitled to any special deference where it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record with respect to which [the trial judge] is no more peculiarly situated to decide than the appellate court.

[Dolson v. Anastasia, 55 N.J. 2, 7 (1969).]

III.

We next apply these general principles to the present facts. Here, the trial court decided defendant's motion on the papers without conducting an evidentiary hearing. As to the first Carter prong, the trial court determined that Wright's recantation was "clearly material" considering she was the State's primary witness and was the only person to have purportedly seen defendant commit the crime. As for the second prong, the trial court found that Wright's recantation was "the next logical step" of the "copious" letters she had sent to defendant.

Turning to the third prong, the trial court determined that Wright's recantation would not change the jury's verdict. The trial court based its decision on the PCR court's and our own review of Wright's previous letter to defendant. Specifically, the trial court relied on the PCR court's review of the original trial

17

transcript, where Wright was cross-examined about a letter she wrote to defendant expressing remorse for testifying against him and was subject to cross-examination on agreements she made with the State in exchange for her testimony. The trial court reasoned that the PCR court's findings were further supported by our 2016 opinion in which we found that Wright's letter to defendant "provided no impeachment material" and "[t]he letter expressed [Wright's] concern about her upcoming testimony and the prosecutor's jailhouse visit to confirm her continued cooperation. However, [Wright] freely admitted during trial that she had undergone trial preparation."

The trial court concluded that the 2018 recantation "provides no further value than the previous letters supplied by the [d]efendant." Thus, the trial court determined that defendant failed to satisfy his burden under prong two to demonstrate that the recantation could not have been discovered by reasonable diligence beforehand.

We do not agree with the trial court that the recantation statement "provides no further value" to Wright's March 31, 2004, letter that had been admitted at trial. We are satisfied the recantation statement goes beyond the March 31 letter because at no point in her letter did Wright explicitly state that she provided false information.

More importantly, with respect to the third prong, we are concerned the trial court may have applied the wrong test. As noted, the critical question regarding recantation testimony is "'whether the testimony given at the trial was probably false' and whether 'on that account there is a substantial possibility of [a] miscarriage of justice.'" Engel, 249 N.J. super at 386 (alteration in original) (quoting Baldwin, 47 N.J. at 400). Under this analytical framework, the trial court should have considered the veracity of Wright's trial testimony in light of her explicit recantation—an issue not yet explicitly resolved by any court. The trial court relied on the PCR court's review of the trial transcript, in which the PCR judge found Wright testified credibly at trial. While reliance on a prior court's credibility finding is permissible, see Locurto, 157 N.J. at 474-75, the PCR court did not have an opportunity to test Wright's credibility firsthand, see Ways, 180 N.J. at 196 ("We defer to a PCR judge's credibility findings because that judge has the ability to evaluate the witnesses firsthand."). Stated another way, Wright has never testified before a judge regarding her 2018 recantation and has not been subject to cross-examination on that statement. Cf. State v. Branch, 182 N.J. 338, 370 (2005) ("We must not minimize the importance of the role that cross-examination plays in the ascertainment of truth in our criminal justice system."). Because no court has yet determined whether Wright was

lying on the stand or lying when she gave her 2018 recantation statement, we are not convinced the trial court was able to engage in the "fact-sensitive analysis" necessary "to determine whether the newly discovered evidence would probably make a difference to the jury." Ways, 180 N.J. at 191. An analysis grounded in a developed factual record is especially necessary here considering the pivotal importance of Wright's trial testimony to the State's case. Cf. id. at 194-95.

We emphasize, moreover, that our deference to a trial court's credibility determinations generally presupposes that it "had the opportunity to observe and hear the witnesses as they testified," Brooks, 366 N.J. Super. at 454 (quoting Russo, 333 N.J. Super. at 137). Considering all of these circumstances, we believe the record should be further developed by providing an opportunity for the trial court to observe Wright's testimony firsthand. In making its firsthand credibility findings, the trial court on remand, of course, should keep in mind that recantation testimony is to be viewed with "extreme suspicion." Hogan, 144 N.J. at 239 (quoting Santiago, 837 F.2d at 1550). But that principle does not categorically eliminate the need to hear from a live recantation witness when they are available.

Accordingly, we remand for the trial court to convene an evidentiary hearing at which Wright will testify to determine whether, in light of her recantation, her trial testimony was probably false. We do not retain jurisdiction.

IV.

We next address defendant's contentions regarding the proffered alibi affidavits. Defendant asserts that three separate alibi affidavits presented post-trial serve as an additional basis for granting a new trial. Specifically, defendant produced a November 19, 2014, affidavit from Barbara Mancle-Miles (Miles); a December 15, 2014, affidavit from Narika Scott (Scott); and a May 9, 2016, affidavit from Josephine Rivera (Rivera), each proffered to support defendant's alibi defense that he was not present at the scene when the Rite Aid shooting occurred.

We have already addressed Miles and Rivera as potential witnesses in our earlier decision affirming the PCR court's denial of defendant's petition. State v. Reevey, No. A-5379-18 (App. Div. Aug. 9, 2021). Exercising original jurisdiction, we found Miles was not credible because "she was unsure whether she testified at defendant's trial when she clearly did not." Id. at 17-18. After reviewing a 2016 affidavit from Rivera that corroborated defendant's version of

21

events on the night of the murder, we likewise concluded that "if Rivera's testimony [was what] was stated in the 2016 affidavit, it would not have mattered." Id. at 20. As the PCR judge noted, defendant's testimony failed to establish an alibi, and given the time of the shooting, Rivera's testimony would not have definitively supported defendant's version of events. See id. at 20.

Having now reviewed the Scott affidavit, we agree with the trial court's finding that it is substantially similar to the previously proffered alibi affidavits. Scott explains that she "vaguely" remembers the times surrounding May 9, 2000. Therefore, her version of events does not definitively establish a defense alibi and fails to satisfy the materiality prong of the Carter test.

Furthermore, the trial court's conclusion that the alibi affidavits could not satisfy prong three of the Carter test is substantially supported not only by the prior PCR court decision but also by our own prior findings. See State v. Reevey, No. A-5379-18 (App. Div. Aug. 9, 2021) (slip op. at 17-18, 20). As the trial court explained, "the PCR court and the Appellate Division actually considered the proffered evidence and determined that [d]efendant could not establish an alibi at the time of the shooting based on this information." In these circumstances, the trial court appropriately denied defendant's motion for a new trial based on the alibi affidavits.

A-2105-24

To the extent we have not addressed them, any remaining arguments made by defendant lack sufficient merit to warrant discussion.  R. 2:11-3(e)(2).

Affirmed in part and remanded in part for proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Hanley

Clerk of the Appellate Division

A-2105-24